In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 13-3795

JOSEPH A. ROSSI,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO and GLENN MATHEWS,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 07 C 6399 — **Edmond E. Chang**, *Judge*

_____

ARGUED JANUARY 22, 2015 — DECIDED JUNE 22, 2015

_____

Before EASTERBROOK, MANION, and WILLIAMS, *Circuit Judges*.

MANION, *Circuit Judge*. Joseph Rossi was assaulted by several persons, one of whom was an off-duty Chicago police officer. Glenn Mathews, a detective with the Chicago Police Department, was assigned to investigate. For six weeks, Mathews did practically no work on the case; he followed zero leads, did not inspect the crime scene, and questioned no witnesses other than Rossi. Aside from taking

some messages and filing perfunctory reports, he exerted no discernible effort. He then closed his investigation.

Rossi sued Mathews under 42 U.S.C. § 1983 alleging that he violated his constitutional right to judicial access because his failure to investigate led to the spoilage of evidence in his civil suit against the assailants. He also brought a *Monell* suit against the City of Chicago for perpetuating a "code of silence" that shields police officers from investigation and promotes misconduct by police. The district court granted summary judgment for the defendants on the grounds that Rossi was not denied judicial access because the police did not conceal from him any facts which prevented him from obtaining legal redress from his assailants. The court also dismissed Rossi's *Monell* claims for lack of evidence of widespread practices on the part of the police department. We affirm.

## I.    Background

On November 11, 2006, Jose Garcia (Jose), president of Garla Trucking and Excavation Company, arranged a meeting at the company's premises with Joseph Rossi. Rossi believed that Jose wanted to meet with him in order to pay him for work that Rossi had previously done for Garla. But Jose had other designs: he sought to question Rossi about a Bobcat construction vehicle that had disappeared from Garla's lot. Jose believed that Rossi knew the whereabouts of the Bobcat and was determined to get him to speak about it, by any means necessary.

What followed resembled less a business meeting than a scene from a gangster film. When Rossi arrived at Garla, Jose, Roberto Garcia (Jose's brother), and two other Garla

employees bound him with electrical cord and duct tape and began beating him. Three hours later, Catherine Doubek, a Chicago Police Officer and the wife of Jose, arrived at Garla's premises to find the crew interrogating Rossi. Instead of intervening, Doubek made a dramatic show (according to the complaint) of removing her police badge to show Rossi that his interrogators could assault him with impunity. After that, Doubek acted as a lookout, utilizing her police radio to monitor activity to ensure that the beating went undetected by police. For the next several hours, Rossi remained tied to the chair while Jose and his associates alternated between questioning him about the Bobcat and beating him.

Rossi eventually escaped in the early morning by sending Doubek on a "wild goose chase"—telling her that the Bobcat was located at an equipment yard on the west side of Chicago. When Doubek left to visit that site, Rossi, finally alone, managed to chew through his restraint and escape barefoot to the nearby home of a stranger where he called an ambulance. In total, Rossi spent six hours bound to a chair; in his haste to escape, he left behind his car keys and other personal items at the scene of the crime.

Hours after the incident, Detective Glenn Mathews, a Chicago Police Detective, interviewed Rossi while he was still at the hospital receiving treatment for his injuries. In a five-minute interview, Rossi recounted the incident to Mathews, including that a Chicago police officer was one of his assailants. However, because Rossi did not know Doubek's name but only knew that she was the wife of Jose Garcia, he initially identified her by the name "Garcia."

Rossi learned of the identity of each of his assailants in the next three days. He called Mathews but was not able to

reach him; instead, he left a message furnishing the name "Catherine Doubek" as the police officer involved in the assault. He also supplied her home address, which (as expected) was the same address as that of Jose Garcia. Having been provided with Doubek's address, Mathews needed only to enter it into the police database—a standard practice in all investigations—to learn that Doubek resided at that address and was married to Jose Garcia. He failed to do this.

Mathews's indolence did not stop there. Despite knowing their names and where they worked, Mathews never attempted to question the suspects. He never visited Garla's premises even though he knew from his initial interview with Rossi that this is where the assault occurred. He never returned Rossi's phone calls, and he never reached out to additional witnesses. Instead, several weeks later—on December 29, 2006—he filed a Supplementary Report in which he spelled Doubek's name as "Dubinek" and then stated that he could not find any such name in the police roster. Mathews requested a suspension of the investigation, ostensibly because he could not ascertain the identity of the police officer.

Because a police officer was reported to have been involved in the assault, the Internal Affairs Division conducted its own investigation—at least in appearance. Officer Dennis Chengary was assigned to this investigation but did not attempt to contact Rossi until December 11, 2006, when he tried to visit him at his apartment. He failed at this because the address listed in the police report was incorrect; in fact, the reported address did not exist. Chengary located Rossi's landlord who provided him with a correct address,

but Chengary did not visit him there. Instead, he attempted to mail a certified letter to Rossi, but proceeded to send it to the incorrect address listed in the police report (which he had tried to visit but failed). Weeks later, Chengary closed the Internal Affairs investigation for lack of evidence.

Frustrated with the lack of effort by police, Rossi told his story to the media who reported it as a police cover-up. Faced with negative publicity, the police finally conducted a thorough investigation in April 2007. When they searched Garla's premises—five months after the assault—the police found that the room in which the interrogation occurred had been cleaned and re-carpeted. They gathered fingerprints, DNA and blood samples, and took photos. Rossi contends that, despite these efforts, the majority of evidence was lost: a rope that was placed around Rossi's neck as a noose; beer cans and other refuse; the chair to which Rossi was bound; the extension cord used to bind Rossi; and Rossi's personal property such as his shoes and socks.

Officer Doubek was not interviewed about her role in the assault until three years later in February 2010. Jose and Roberto Garcia were convicted in state court of aggravated battery and unlawful restraint in connection with the incident. Doubek, however, was not charged; nor was she disciplined by the police department.

Rossi brought civil claims against each of the assailants and those have subsequently settled. He received $80,000 from the Garla defendants and an undisclosed amount from Doubek. The only remaining claims are those against Mathews and the City of Chicago. These claims allege that Mathews's failure to investigate violated his civil rights under 42 U.S.C. § 1983 and led to the spoilage of evidence

that he could have used favorably in his civil suit against his assailants. He also brought a *Monell* suit against the City, alleging that the police force cultivated, and the City allowed, a "code of silence" that shields police officers from investigation and promotes a culture of misconduct among police that contributed to his assault.

The district court granted summary judgment for the defendants because Rossi had not demonstrated that the defendants violated a clearly established constitutional right as is required to prevail on a § 1983 claim. Specifically, the district court found that Mathews did not deny Rossi judicial access because his failure to investigate did not prevent Rossi from discovering the identities of the assailants—he already knew who assaulted him and was able to recover for his injuries in a civil suit against them. Additionally, the district court granted summary judgment against Rossi's *Monell* claim because he did not submit evidence suggesting widespread practices by the police of failing to adhere to ethical conduct.

Following the denial of Rossi's motion for reconsideration, the district court awarded the City $7,443 in costs as the prevailing party.

## II.     Analysis

To survive a summary judgment motion, a plaintiff suing under 42 U.S.C. § 1983 must show that there is a genuine issue of material fact (that is, a fact capable of affecting the outcome) about one or more of the essential elements of the action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We review the district court's grant of summary judgment *de novo*, construing all facts and reasonable inferences in Rossi's

favor. *Smiley v. Columbia College Chicago*, 714 F.3d 998, 1001 (7th Cir. 2013). To obtain relief under § 1983, Rossi must demonstrate that a person acting under color of state law deprived him of a right, privilege, or immunity secured by either the Constitution or by federal law. Rather than acting as a source of rights, § 1983 serves as a vehicle for "vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

### A. Right to Judicial Access

The First and Fourteenth Amendments protect the rights of individuals to seek legal redress for claims that have a reasonable basis in law and fact. *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002). Interference with the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under § 1983. *Bounds v. Smith*, 430 U.S. 817, 822 (explaining that judicial access must be "adequate, effective, and meaningful").

Here, Rossi claims that Detective Mathews violated his right to judicial access by failing to investigate the crime scene and purposefully concealing Doubek's identity. Mathews, in turn, argues that Rossi was not denied judicial access because he was able to obtain settlements from each of his assailants. Absent a constitutional violation, Mathews, as a public official, is shielded from liability by qualified immunity. *Viilo v. Eyre*, 547 F.3d 707, 709 (7th Cir. 2008).

We note at the outset that Rossi does not have a constitutional right to have the police investigate his case at all, still less to do so to his level of satisfaction. *See, e.g., DeShaney v. Winnebago County Department of Social Services*,

489 U.S. 189, 196 (1989) (holding that the Constitution "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary secure life, liberty, or property interests of which the government itself may not deprive the individual."). While *DeShaney* does not address police behavior specifically, the implication is clear: mere inactivity by police does not give rise to a constitutional claim. For this reason, the operative question is not whether Rossi's case would have been better had the police conducted a worthy investigation, but whether their failure to do so limited his ability to obtain legal redress to such degree that it constituted a denial of judicial access.

Our analysis in this case is guided by two decisions of this court where we examined police cover-ups of varying orders of magnitude. The first case is *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), and involved an egregious police cover-up that effectively denied a plaintiff judicial access. Eleven years later, we examined another police cover-up in *Vasquez v. Hernandez*, 60 F.3d 325 (7th Cir. 1995), but held that the plaintiff was not denied judicial access notwithstanding a faulty initial investigation. We examine each in turn.

In *Bell*, police officers shot and killed Daniel Bell after a brief chase. They then planted a knife in his hand and created a fictitious story that Bell had threatened them with the knife. An internal investigation ensued which cleared the officers of wrongdoing and contributed to the decision of Bell's father to settle his lawsuit with the city for a meager sum (though he never cashed the check). Two decades later, information surfaced that revealed that the police officers had fabricated the story and planted the knife on Bell. The

family filed another lawsuit and a jury awarded them a substantially greater sum in damages.

The facts in *Vasquez* are similar in kind but not degree. In *Vasquez*, the plaintiff, a young girl, was struck in the ear by a stray bullet fired by her neighbor, an off-duty police officer, who was intoxicated at the time. The police investigated—half-heartedly, by all appearances—and found nothing. A separate task force of state and federal officials then investigated and identified the police officer as the shooter. After the investigation by the task force—and before the statute of limitations had expired—the plaintiff sued the original investigating officers, alleging that they denied the plaintiff's right to judicial access by covering up for the off-duty police officer.

We recognized a constitutional violation for denial of judicial access in *Bell* but not in *Vasquez*. We did so based on the differing effects that the alleged cover-ups had on the ability of the respective plaintiffs to achieve legal redress despite the lack of cooperation by police. In *Bell*, the cover-up effectively foreclosed the ability of Bell's father to learn the facts of his case and to seek relief for any injury. *Bell*, 746 F.2d at 1261 ("Though [the father] filed a wrongful death claim in state court soon after the killing, the cover-up and resistance of the investigating police officers rendered hollow his right to seek redress"). In so holding, we factored heavily the interval between the initial investigation and the disclosure of the true facts; after two decades, the period of limitations had run and the possibility of timely legal redress had been permanently thwarted by the cover-up.

In contrast, the cover-up in *Vasquez* merely delayed but did not ultimately prevent the plaintiff from receiving legal

redress. The six-month interim between the shooting and the identification of the shooter still allowed sufficient time for the plaintiff to file a civil action before the expiration of the limitations period. Further, the subsequent investigation by the task force aided the plaintiffs in their civil tort case. 60 F.3d at 329 ("Unlike the twenty year delay in *Bell*, the actual circumstances surrounding the shooting here were revealed publicly within six months of the incident …. Hence, the delay, albeit frustrating for the Vasquezes, has not been without some benefit to them.").

We agree with the district court that the facts of this case more closely resemble those of *Vasquez* than *Bell*. First, there is the order of magnitude of the misbehavior—in *Bell* police officers shot a man under questionable circumstances, conspired to plant a knife on him, and then engineered an investigation designed to conceal rather than reveal the truth. Having secured its bargaining position, the city then forced the father of the deceased to accept a lowball settlement. By contrast, the misbehavior of police here (and in *Vasquez*) did not so damage the plaintiff's litigation posture that it precluded adequate relief. Mathews did not conceal any facts about the incident that were not already known to Rossi. Nor was Rossi reliant on Mathews to discover facts necessary to fill in gaps in his knowledge. He knew who the perpetrators were, where the incident occurred, and he had full access to much of the evidence required to prevail in a civil suit: witnesses, medical records, police reports, and other documentary evidence. All of this was available to Rossi and was not contingent on a rigorous police investigation.

Finally, there were the curative measures. In this case, as in *Vasquez*, a proper investigation was conducted within months of the crime and before the expiration of the limitations period. Like *Vasquez*, Rossi was able to use the findings of these investigations in his civil suit against his assailants. To be sure, Rossi's case would likely have been stronger had Mathews conducted a prompt search of Garla's premises, but this fact, standing alone, is not sufficient to support the conclusion that Mathews's actions denied Rossi an opportunity to achieve sufficient redress through a civil action.

Whether a cover-up (or a clear failure to investigate) occurred is merely one, albeit important, factor in determining whether a denial of judicial access occurred; the plaintiff must also show that the police's actions harmed his ability to obtain appropriate relief. This will depend on factors such as whether the plaintiff was able to discover the facts on his own, whether a proper investigation was later conducted, and whether the true facts are disclosed prior to the expiration of the limitations period.

Rossi was not denied judicial access because he knew all of the relevant facts of his case and was free to pursue legal redress at all times. In so concluding, we are reminded of our decision in *Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994), where we arrived at the same result despite different facts. In *Thompson*, a police officer fractured the vertebrae of a plaintiff while arresting him after a high-speed chase. The plaintiff sued for denial of access to justice because the officer did not include any details about his use of force in the police report. We concluded that the plaintiff had not been denied access to justice because "the facts known to

[him] concerning the arrest were sufficient to enable him to promptly file the instant lawsuit unlike *Bell*, where the true facts were concealed." *Thompson*, 33 F.3d at 852.

The actions of Detective Mathews—defensible or not—in no way prevented Rossi from exercising his right to seek legal redress. For this reason, Rossi failed to establish a violation of his constitutional right to judicial access and Mathews is shielded from liability by qualified immunity.

### B. *Monell* Claims

Rossi also appeals the district court's grant of summary judgment to the City on his *Monell* claim. A government entity can be held liable under § 1983 when the execution of a government policy or custom is deemed to inflict an injury on a plaintiff. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978). But a municipality cannot be held liable solely on the grounds of *respondeat superior*. *Id* at 691. The Supreme Court has recognized three particular grounds on which a municipality can be held liable under § 1983. There must be: (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well-settled that it constitutes a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused a constitutional injury. *Lawrence v. Kenosha County*, 391 F.3d 837, 844 (7th Cir. 2004).

Finding that Rossi had not offered sufficient evidence to support his *Monell* claims, the district court granted summary judgment for the City. The court first examined Rossi's contention that the City engaged in a widespread

practice of allowing police officers to consort with convicted felons despite an official policy prohibiting such associations. Rossi's evidence was limited to deposition testimony from a Chicago police lieutenant who claimed that he investigated numerous allegations of improper relationships between Chicago police officers and felons. Significantly, the plaintiff did not elicit any testimony about the quantity, frequency, or nature of the relationships investigated. Given the lack of context, the lieutenant's testimony served more as a passing comment than evidence demonstrating a *widespread practice* of inappropriate relationships by police in contravention of an official policy. The district court rightly rejected this evidence.

Rossi's second contention is closer to the mark as it alleges a "code of silence," namely a failure on the part of the police department to discipline and train officers regarding ethical conduct. The district court ruled against Rossi on evidentiary grounds, not because this theory was defective. Indeed, the facts of this case—where Mathews and Chengary conducted superficial investigations and Doubek faced no official discipline for her actions—raise serious questions about accountability among police officers. But a *Monell* claim requires more than this; the gravamen is not individual misconduct by police officers (that is covered elsewhere under § 1983), but a *widespread practice* that permeates a critical mass of an institutional body. In other words, *Monell* claims focus on institutional behavior; for this reason, misbehavior by one or a group of officials is only relevant where it can be tied to the policy, customs, or practices of the institution as a whole.

Rossi failed to do that here. He did not retain a defense expert for his case and his pre-trial disclosures failed to identify any expert reports addressing this particular issue. Rossi did offer three expert reports that were submitted in a separate case, *Obrycka v. City of Chicago*, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012). The district court declined to consider these reports because they did not comply with the disclosure requirements of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(e)(2). The exclusion of non-disclosed evidence is "mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). In the context of this case, the non-disclosure was neither harmless nor justified because it deprived the city of any opportunity to retain its own experts to analyze the merits of the factual claims of the expert reports. The district court, therefore, did not abuse its discretion in declining to consider the expert reports.

The remaining evidence submitted by Rossi is anecdotal and does not establish a tie between the actions of the individual officers and the police department as a whole. He submitted various remarks by district judges critical of the Chicago Police Department but the district court rightly declined to consider these as the judicial comments do not qualify as evidence. Rossi's other evidence is likewise unavailing. He cites to the Independent Police Review Authority but fails to articulate how the existence of this body demonstrates anything about widespread practices on the part of a large and diverse institution such as Chicago Police Department.

For these reasons, the district court did not err in granting summary judgment for the City on Rossi's *Monell* claims.

### C. Award of Costs

Rule 54 of the Federal Rules of Civil Procedure provides that, in the absence of a federal statute, rule, or court order directing otherwise, courts should award costs to the prevailing party. Fed. R. Civ. P. 54(d)(1). The district court complied with this rule and awarded costs to the City.

Rossi objects because he is unable to pay costs due to his financial condition. His claim could have some merit in light of the protracted litigation, however he failed to provide an affidavit or any other documentary evidence to support his claim. The burden of proving financial hardship falls on the objecting party, who must provide the court with sufficient documentation such as affidavits, statements of assets and income, and a schedule of expenses. *Rivera v. City of Chicago*, 469 F.3d 631, 635 (7th Cir. 2006). Because Rossi provided no such evidence, the district court acted within its discretion to award costs to the City.

### III.    Conclusion

For the foregoing reasons, we AFFIRM the grant of summary judgment by the district court.