In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-3334

KEVIN HARER and HEATHER HARER,
Co-Executors of the Estate of Samantha Harer,

*Plaintiffs-Appellees,*

*v.*

SHANE CASEY, *et al.,*

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-06822 — **Robert W. Gettleman**, *Judge.*

ARGUED MAY 26, 2020 — DECIDED JUNE 12, 2020

Before FLAUM, SCUDDER, and ST. EVE, *Circuit Judges.*

FLAUM, *Circuit Judge.* Samantha Harer died from a gunshot wound to the head. The coroner concluded Samantha committed suicide. Samantha's parents, Kevin and Heather Harer, reject this finding. The Harers claim Samantha's boyfriend, Felipe Flores—a police officer for the town of Crest

Hill, Illinois—murdered Samantha during an argument at her home in neighboring Channahon, Illinois.

The Harers sued Flores and Crest Hill in federal court: Flores for wrongful death (among other torts) and Crest Hill for its alleged unconstitutional practice of concealing officers' misconduct, which the Harers allege emboldened Flores to kill Samantha. The Harers also sued the Town of Channahon and its Chief of Police Shane Casey, its Deputy Chief of Police Adam Bogart, and Detective Andrew McClellan (collectively, the "Channahon defendants"), asserting these defendants denied the Harers their constitutional right of access to court when they engaged in a cover-up to protect Flores.

The Channahon defendants moved to dismiss the access claim, arguing they did not prevent the Harers from initiating a wrongful death lawsuit against Flores within the statute of limitations. The district court denied the motion, holding that the Channahon defendants still frustrated their judicial access by delaying the Harers' suit and costing them money. Additionally, the court ruled that clearly established law prohibited the officers' conduct, so qualified immunity did not shield the officers from suit.

We reverse the court's judgment because the Harers have access to remedies—and therefore access to court—in their pending wrongful death suit. Accordingly, the Harers' access claim (Count II) is not ripe for review, and we remand with instructions to dismiss it without prejudice.

## I. Background

Kevin and Heather Harer claim that their daughter Samantha's boyfriend, Felipe "Phil" Flores—a police officer in Crest Hill, Illinois—shot Samantha to death. Because this case

comes to us on an interlocutory appeal from a denial of qualified immunity on the pleadings, we recapitulate below the Harers' "well pleaded factual allegations in the complaint," which we accept "as true …, draw[ing] all reasonable inferences in the [Harers'] favor." *Hardeman v. Curran*, 933 F.3d 816, 819 (7th Cir. 2019).

### A. Facts

On February 12, 2018, Samantha and Flores had a fight in Samantha's apartment in Channahon, Illinois. Consequently, the couple slept separately that night: Samantha in her bedroom and Flores on the couch. At 8:00 a.m. the next morning, Flores confronted Samantha about her text conversations with another officer that Flores discovered on her cell phone. The confrontation escalated. A neighbor heard banging on the walls and a woman repeatedly yelling: "Let me go."

At 8:19 a.m., Flores called 9-1-1 and told the operator that Samantha had shot herself. He explained that they had been arguing, she had asked him to leave, and he was in the process of leaving when he heard Samantha's "gun rack" followed by a single shot. Samantha's bedroom door was locked, so he "busted into the bedroom." Flores saw Samantha unconscious with a head wound and a gun laying between her legs. The operator suggested Flores perform CPR, but Flores declined; he said Samantha was not breathing and that he could see her brain matter. Flores told the operator that he never touched Samantha's body. (He later recounted that he had lifted her head after she shot herself. The police never asked Flores to reconcile these inconsistent statements.)

Thereafter, police and emergency personnel arrived. They observed a gunshot wound to Samantha's head, among other

injuries, and detected a faint pulse. Although Flores told them that he was on the other side of the locked door when he heard Samantha shoot herself, there was blood spattered on the front and right sleeve of Flores's sweatshirt. Likewise, Flores's white socks did not have any blood on them, despite that he said he was "kneeling" next to Samantha and "talking to her" while he was still on the phone with the operator. Paramedics took Samantha to the hospital, where she died.

An hour after the shooting, the Channahon detective in charge of investigating Samantha's death, Andrew McClellan, examined the scene. He did so with a forensic evidence technician from the Illinois State Police. As the technician was evaluating the blood spatter evidence, Detective McClellan incorrectly told him that Flores had rendered aid to Samantha. The Harers believe the detective misled the technician to minimize the significance of the blood splatter on Flores's sweatshirt. They home in on how the investigators failed to ask Flores why he had blood spatter on his clothing if he was not in the room when Samantha discharged the weapon.

What is more, the Harers say the investigators never questioned Flores about why they found Samantha naked if the couple was allegedly arguing prior to the shooting. Rather, the investigators simply accepted Flores's story that Samantha was just "depressed," as opposed to testing Flores for alcohol and drug use and looking into his prior history of violence against women. This alleged misconduct culminated in Detective McClellan either implicitly or explicitly instructing the technician to make a preliminary finding of suicide. The technician complied and—without processing any forensic evidence or talking to Flores, or any other witness—determined that the scene was consistent with a suicide.

A day later, Detective McClellan, joined by Channahon Chief of Police Shane Casey, told Samantha's parents that their daughter had died from a self-inflicted gunshot wound. Chief Casey and Detective McClellan did not tell the Harers that a neighbor had heard a struggle shortly before the shooting or that Flores's sweatshirt had blood spatter on it. Instead, they told the Harers that Samantha's hand was positive for gunshot residue and that Flores's was negative. That was not true. No test discovered any gunshot residue on Samantha's hands. Conversely, tests revealed gunshot residue on Flores's right hand and the front and cuffs of his sweatshirt.

Eventually, a police officer in neighboring Plainfield came forward with pertinent information about Samantha. Detective McLellan did not seek to interview the Plainfield officer until three days before Channahon closed its investigation. The Plainfield officer had frequently texted with Samantha and told the detective that there was "no way" Samantha would kill herself. Following the interview, Channahon promptly closed the investigation without anyone ever addressing the matter with Flores.

According to the Harers, the police refused to communicate with them, failing to provide even basic information about who was supervising the investigation. At their wits' end, the Harers retained an attorney to help them get answers to their questions about their daughter's death.

## B. Procedural History

With the investigation into Samantha's death up in the air, the Harers sued Flores, Crest Hill, and Channahon in federal court for conspiracy and excessive force under 42 U.S.C. § 1983 and *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

Counsel for the Harers withdrew in November 2018. The defendants then moved to dismiss the claims alleged against them in the Harers' complaint. The district court scheduled a status hearing for December 13, 2018. The Harers, lacking legal representation, did not attend. The court rescheduled the hearing and admonished the Harers to "appear at the 1/22/2019 hearing or this case will be dismissed for want of prosecution."

On December 28, 2018, the Harers met with Chief Casey, his deputy Adam Bogart, a coroner, a prosecutor, and counsel for Channahon. Chief Casey and Deputy Bogart informed the Harers that they had officially ruled Samantha's death a suicide. The authorities based their decision on forensic evidence demonstrating that the gunshot wound was self-inflicted. Chief Casey and Deputy Bogart additionally told the Harers that Samantha's toxicology report pointed to suicide.

Unconvinced, the Harers asked when they could receive and inspect their daughter's belongings. The authorities told them they could retrieve Samantha's property upon the dismissal of their civil lawsuit. Similarly, the police department refused to provide any investigative materials to the Harers until after the dismissal of their suit. Believing that the official finding of suicide now barred their pending lawsuit from proceeding, the Harers did not show up to court for the January 22 status hearing. Hence, the court dismissed the case for want of prosecution.

The Harers subsequently learned that the gunshot residue analysis implicated Flores, not their daughter. They also discovered that Chief Casey and Deputy Bogart's statements regarding Samantha's toxicology report were false. The results, in fact, were inconsistent with suicide. Accordingly, the

Harers retained new counsel who swiftly moved to vacate the judgment of dismissal under Federal Rule of Civil Procedure 60(b). In the motion, the Harers insisted that they only stopped prosecuting their case because of the incompetence and ethical lapses of original counsel. Moreover, the Harers maintained that they left the December 2018 meeting thinking that their lawsuit could not move forward after the coroner ruled Samantha's death a suicide. The district court granted the motion and the Harers filed their first amended complaint.

A few weeks later, the Harers sought leave to file a second amended complaint, reasserting their original claims and naming Chief Casey, Deputy Bogart, and Detective McClellan as defendants in a new access-to-court claim. The court granted leave, and the Harers filed the operative second amended complaint, asserting a *Monell* claim against Crest Hill (Count I); an access-to-court claim against Casey, Bogart, McClellan, and Channahon (Count II); wrongful death-battery against Flores (Count III); Survival Act – Battery against Flores (Count IV); and Survival Act – Intentional Infliction of Emotional Distress against Flores (Count V).

The Channahon defendants moved to dismiss the access-to-court claim, arguing that no constitutional deprivation occurred, and even if it did, they were entitled to qualified immunity. The district court denied the motion, reasoning that the Harers adequately pleaded an access-to-court claim based on the December 2018 meeting. In the district court's view, "the Harers had to litigate their motion to reopen only because Channahon fooled them into dropping their suit." This unnecessary litigation, the court ascertained, caused the Harers to spend "time and money that they would not otherwise

have needed to spend." Additionally, the court rejected the individual officers' qualified immunity defense because of the officers' clear failures in their investigation.

This interlocutory appeal followed.

## II. Discussion

As a threshold matter, the Harers argue we lack appellate jurisdiction to resolve this case in its present interlocutory posture. We only exercise our jurisdiction over appeals from "final decisions" of district courts, and a denial of a motion to dismiss is generally not one such final decision. 28 U.S.C. § 1291. For that reason, a denial of a motion to dismiss typically is not immediately appealable. *See Jackson v. Curry*, 888 F.3d 259, 262 (7th Cir. 2018).

But the collateral-order doctrine provides a limited exception to this rule. "The collateral-order doctrine permits an immediate appeal of the denial of qualified immunity at the pleadings stage … ." *Id.* Appellate jurisdiction over denials of qualified immunity extends to "pure legal questions. … Thus, defendants cannot immediately appeal factual determinations regarding qualified immunity." *Id.* An order denying qualified immunity that turns on a pure legal issue is a "final decision" under § 1291.

In this appeal, the Channahon defendants "accept the facts and reasonable inferences favorable to [the Harers] for purposes of the qualified-immunity inquiry at this stage." *Id.* They simply contend that "those facts and inferences do not establish a violation of a clearly established constitutional right … ." *Id.* at 263. "[W]e have jurisdiction to entertain that argument" because the Harers have not identified a single factual dispute that the Channahon defendants ask us to resolve.

*Id.* Our jurisdiction is therefore secure. *See, e.g., Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).

Turning to the district court's substantive analysis of the Harers' access-to-court claim, our standard of review is de novo, as this appeal only presents questions of law. *See Triad Assocs., Inc. v. Robinson*, 10 F.3d 492, 495 (7th Cir. 1993). We conclude that the access claim is premature, or not ripe for judicial review, because the Harers' wrongful death lawsuit remains pending with remedies available. *Cf. Squires-Cannon v. Forest Pres. Dist. of Cook Cty.*, 897 F.3d 797, 801 n.1 (7th Cir. 2018) ("The lack of a final judgment in the [underlying] action could create a ripeness issue" for a claim derived from that action.). Neither the district court nor the parties addressed this issue in terms of ripeness. But because ripeness implicates the district court's subject-matter jurisdiction under Article III of the Constitution, we must consider the question on our own accord.[1] *See, e.g., Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 n.13 (1991).

Our opinion proceeds in four parts. First, we outline the national law of judicial access, and specifically, backward-

---

[1] Our prior precedents have not resolved access-to-court claims on ripeness grounds. *See generally Harrell v. Cook*, 169 F.3d 428 (7th Cir. 1999); *Vasquez v. Hernandez*, 60 F.3d 325 (7th Cir. 1995). Those decisions, however, are distinguishable. In both *Harrell* and *Vasquez*, the plaintiffs' underlying tort claims were not pending at the same time—let alone in the same case—as their access claims; the plaintiffs, indeed, were not pursuing any tort claims at all. *Harrell*, 169 F.3d at 430–31; *Vasquez*, 60 F.3d at 326–28. In contrast, here the Harers are actively litigating their underlying tort claims alongside their access claim in the district court. We have previously never been presented with a record that affords the same opportunity to recognize that the appropriate disposition of an access claim, brought while the underlying tort claim is pending, is dismissal without prejudice.

looking access claims alleging police misconduct in this Circuit. Second, we identify the available relief that creates a ripeness problem for this specific access claim. Third, we assume for argument's sake that relief is unavailable, and that the access claim is therefore ripe, to demonstrate that the district court erred when it sustained the access claim on the officers' post-filing misconduct. Fourth, we close with a comment on qualified immunity. Ultimately, we order the dismissal without prejudice of the access claim.

**A.  Access to Court**

The Constitution promises individuals the right to seek legal redress for wrongs reasonably based in law and fact. *See Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002); *Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004). A corollary of this right is the freedom from police interference with access to court, such that an officer's intentional concealment of "the true facts about a crime may be actionable as a deprivation of constitutional rights under [42 U.S.C.] § 1983." *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015); *see also Vasquez*, 60 F.3d at 328 (stating that police officers abridge constitutional rights when their obfuscation of important facts about a crime "render[s] hollow the right to seek redress").

Granted, there is no "constitutional right to have the police investigate [any] case at all, still less to do so to [anyone's] level of satisfaction." *Rossi*, 790 F.3d at 735; *see also Owsley v. Gorbett*, No. 19-1825, 2020 WL 2832116, at *2 (7th Cir. June 1, 2020) ("A person can have ample access to the courts, though it will be hard to assemble the evidence needed to win."). Put another way, "mere inactivity by police does not give rise to a constitutional claim." *Rossi*, 790 F.3d at 735. In this regard, "the operative question is not whether [a plaintiff's] case

would have been better had the police conducted a worthy investigation, but whether their failure to do so limited his ability to obtain legal redress to such degree that it constituted a denial of judicial access." *Id.*

In *Christopher*, the Supreme Court bifurcated access-to-court claims into two categories: "forward-looking," and relevant here, "backward-looking" claims. 536 U.S. at 413 & 414 n.11. Backward-looking claims concern "specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Id.* at 413–14. To use the terminology, "[t]hese cases do not look *forward* to a class of future litigation, but *backward* to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* at 414 (emphasis added). Unlike forward-looking claims, the "ultimate object" of backward-looking claims "is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." *Id.*

The Supreme Court assumed without deciding that the backward-looking court of appeals decisions it cited in *Christopher* were correct. *Id.* at 414 n.9. One such decision was our opinion in *Bell v. Milwaukee,* 746 F.2d 1205 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005). For this Circuit, *Bell* marked the birth of backward-looking access-to-court claims premised on officer misconduct. *Bell* also serves as an example of how a police cover-up can effectively—but not literally—deny a plaintiff access to court.

In that case, Bell's father sued officers for his son's wrongful death and settled for a sum so meager that he never cashed

the check. *Id.* at 1215. Twenty years later, one of the officers admitted to a cover-up. *Id.* Bell's family filed another lawsuit, alleging that the police department conspired to conceal the true way Bell died and that this conspiracy deprived the plaintiffs of their due process right of access to court. *Id.* at 1224. The jury returned a verdict for the Bells and awarded them damages that were significantly higher than the amount Bell's father previously settled for. *Id.* at 1225.

On appeal, Milwaukee argued that the federal Constitution did not protect the Bells' right of access to court. *Id.* at 1260. We held that the police officers' obstruction of Bell's father's legitimate efforts to vindicate his son's killing interfered with his due process right of judicial access. *Id.* at 1261. The cover-up effectively foreclosed Bell's father's ability to gather the facts and pursue relief. *Id.* We reached this result in large part because of the substantial prejudice caused by the excessive delay. *Id.* at 1264. Among other things, the statute of limitations had expired, meaning the cover-up had permanently obstructed the potential for legal redress on the underlying wrongful death claim. *Id.* at 1231.

Since *Bell*, we have examined backward-looking access-to-court claims asserting police cover-up theories on a few other occasions. *See Rossi*, 790 F.3d at 735–37; *Cannon v. Burge*, 752 F.3d 1079, 1096–1101 (7th Cir. 2014). We have consistently highlighted that "[t]he cornerstone of our decision in *Bell* was that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs' right of access." *Vasquez*, 60 F.3d at 329. A cover-up that somewhat delays redress but "still allow[s] sufficient time for the plaintiff to file a civil action before the expiration

of the limitations period" does not substantially prejudice the plaintiff's access to court. *Rossi*, 790 F.3d at 736.

As *Bell* and its progeny appreciate, the road to relief for a backward-looking access-to-court claim—which is what the Harers seek here—is an exceedingly narrow one. The Harers must show that the Channahon defendants' actions effectively precluded them from obtaining relief on their underlying claims. "The most compelling evidence would be if [the Harers] went to the … courthouse and w[ere] physically prevented or mechanically barred from filing [their] lawsuit or [their] suit was dismissed as untimely." *Swekel v. City of River Rouge*, 119 F.3d 1259, 1264 (6th Cir. 1997). This appeal, however, does not hinge on whether the Harers could enter the courthouse and file suit because, like Bell's father, they have. Rather, the issue is whether the alleged police cover-up has rendered the Harers' already-filed suit ineffective. *See id.* (In legal terms, the Harers have founded their claim upon a constructive—not an actual—denial of access to court.) We move to that matter now.

### B. Remedies and Ripeness

The Harers ground their backward-looking access-to-court claim in the theory that the defendants' alleged cover-up frustrated their wrongful death and other tort claims against Flores. The Harers argue that the defendants obstructed their meaningful access to court both before and after they filed their lawsuit; specifically, that the officers have been purposefully misleading and lying to them about the underlying facts of the investigation to cover up Samantha's murder at the hands of Flores. The Harers essentially allege that the police department sabotaged its investigation and is still concealing and obscuring important facts about Samantha's

death. To this day, the Harers assert, the police seek to prevent the Harers from uncovering the truth about what happened to their daughter.

To determine whether a plaintiff has meaningful and effective access to court, we require the plaintiff to identify: (1) a nonfrivolous, underlying claim; (2) the official acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a suit or settlement. *See Christopher*, 536 U.S. at 415; *Steidl v. Fermon*, 494 F.3d 623, 633 (7th Cir. 2007); *Snyder*, 380 F.3d at 296 (Ripple, J., dissenting); *see also Waller v. Hanlon*, 922 F.3d 590, 602 (5th Cir. 2019); *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013); *Broudy v. Mather*, 460 F.3d 106, 120 (D.C. Cir. 2006).

We can assume for the sake of argument that the Harers' claim satisfies the first and second elements. (This assumption we make for the purposes of decision is a substantial one, given our doubts about what constitutes clearly established law in this context. *Infra* at 22; *see also Owsley*, 2020 WL 2832116 at *1–2 (expressing "doubts" and "skepticism" about a similar access approach).) The Harers' claim nevertheless fails on the third element: They have not specified what remedy the alleged police cover-up has put out of reach. *Cf. Rossi*, 790 F.3d at 736 ("Whether a cover-up (or a clear failure to investigate) occurred is merely one, albeit important, factor in determining whether a denial of judicial access occurred; the plaintiff must also show that the police's actions harmed his ability to obtain appropriate relief.").

Generally speaking, "[a] backwards looking access claim *may* arise where a plaintiff alleges an underlying claim cannot be tried, or be tried with all the evidence, because official conduct caused the loss or inadequate resolution of that claim."

*Lynch v. Barrett*, 703 F.3d 1153, 1157 (10th Cir. 2013); *see also Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 625 (9th Cir. 1988) (requiring an access-to-court plaintiff to "causally connect[ ]" the defendants' actions to a "failure to succeed in the present lawsuit"). The Channahon defendants have not caused the loss or inadequate resolution of the Harers' underlying tort claims. Quite the contrary, the Harers' are actively litigating those claims with evidence they have adduced. There is nothing in the record to suggest that the remedy the Harers seek is "not otherwise available" in their pending lawsuit against Flores. *Christopher*, 536 U.S. at 415.

We could debate whether the Harers' allegations, if true, will affect the Harers' ability to recover on the underlying claims. They may or may not; it is just "too early to say. Unless and until the [Harers'] claim against [Flores] suffers some concrete setback traceable to the defendants' alleged cover-up, their allegation that the defendants impaired their effort to bring that claim is no more than speculation about an event that may or may not come to pass." *Waller*, 922 F.3d at 602; *see also id.* at 603 ("[A]ny harm … has yet to manifest."); *Swekel*, 119 F.3d at 1264 ("A plaintiff cannot merely guess that a … remedy will be ineffective because of a defendant's actions."). We need look no further than the Harers' own appellate brief to realize that "[t]he extent to which Channahon[ ] … has permanently impeded Plaintiffs' ability to demonstrate that Flores murdered Samantha Harer is unknown."

This uncertainty is why an access-to-court claim ordinarily may not proceed at the same time and in the same case as a timely-filed underlying claim; a remedy cannot be ineffective if it is yet to be realized. *Cf. Swekel*, 119 F.3d at 1264

("[H]ow is this court to assess whether … access was in fact 'effective' and 'meaningful'?"). The filing of a case undermines the argument that an individual lacks access to court. *See Delew v. Wagner*, 143 F.3d 1219, 1223 (9th Cir. 1998) ("[B]ecause the Delews' wrongful death action remains pending in … court, it is impossible to determine whether this [foreclosure of access] has in fact occurred."); *see also Pollard v. Pollard*, 325 F. App'x 270, 272 (4th Cir. 2009) ("Pollard's timely-filed wrongful death action is pending … and therefore she cannot credibly assert that Defendants' actions foreclosed her ability to file suit.").

We simply cannot measure the adequacy of relief if the pursuit of relief—*i.e.*, the prosecution—is ongoing. For this reason, relief must be "completely foreclosed," *Broudy*, 460 F.3d at 120 (citation omitted), whether by "[1] the loss or inadequate settlement of a meritorious case, [2] the loss of an opportunity to sue, or [3] the loss of an opportunity to seek some particular order of relief," *Christopher*, 536 U.S. at 414 (citations omitted). In other words, a plaintiff must "demonstrate substantial and irreparable prejudice" to his or her sought-after remedy. *Flagg*, 715 F.3d at 179 (indicating that "merely 'arguable claims are settled, bought, and sold,'" so "even a marginal weakening of the underlying claim might suffice … because it might have irreversibly reduced the amount for which the defendant would be willing to settle.") (citation omitted).

Any other rule would contradict the Supreme Court's direction that a remedy available "in some suit that may yet be brought" or for "a presently existing claim" defeats this element of a plaintiff's access-to-court claim. *Christopher*, 536 U.S. at 415–16; *see also id.* at 414 ("These cases … look … *backward*

to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable.") (emphasis added). Resolution of the underlying claims is essential because the entire paradigm of backward-looking access "turns on … an opportunity already lost, [and] the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414–15; *see also id.* at 415 ("[The Supreme Court's] cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court.").

We remain mindful that "[t]here is … no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." *Id.* at 415. Indeed, perhaps that is why courts often describe access claims as arising in a *separate* lawsuit from the underlying litigation. *See, e.g.*, *In re Maxy*, 674 F.3d 658, 660–61 (7th Cir. 2012) ("Relief for the denial of access to the courts is intended to remedy rights denied in a separate case due to the impediment.").[2]

---

[2] To be clear, we do not hold "that a filed suit on the underlying claim is a prerequisite for a backward-looking access claim, because [such a holding] would foreclose access claims in the most heinous cases where a cover-up was so pervasive that any timely attempt to litigate would have seemed futile." *Christopher*, 536 U.S. at 416 n.14; *see also Bell*, 746 F.2d at 1261 ("To deny such access defendants need not literally bar the courthouse door or attack plaintiffs' witnesses . … Though [the plaintiff] filed a wrongful death claim in … court soon after the killing, the cover-up and

Here, it is precisely because the Harers are in court on the underlying claims that they do not have an access-to-court claim. The Harers were able to file this lawsuit and present substantial facts of central importance to their case. *See Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) ("[A] plaintiff who has knowledge of the facts giving rise to his claim and an opportunity to rebut opposing evidence *does* have adequate access to a judicial remedy."). "Indeed, this very opinion demonstrates that the [Harers] have been able to develop the facts in this case quite effectively." *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003).

Not only are the Harers' claims pending in federal court, the Harers have the full discovery process available to them. They can submit requests for documents, issue interrogatories, take depositions, and the like as part of trying to learn, confirm, or uncover facts to support their theories of wrongful death and related cover-up. All discovery will occur under the district court's supervision, and the court can address any fraud it finds. Discovery provides the Harers with access to information, and as a result, access to court.

Our point is that the Harers may yet obtain damages through their wrongful death and other tort claims against Flores for allegedly murdering their daughter, not to mention their *Monell* claim against Crest Hill. *See Christopher*, 536 U.S. at 421–22 (determining that other avenues were open for the recovery of money damages in additional pending causes of action, such as an intentional infliction of emotional distress claim, so there was no basis for an access-to-court claim); *see*

resistance of the investigating police officers rendered hollow his right to seek redress … .").

*also Steidl*, 494 F.3d at 633 (concluding plaintiff was requesting same relief in access claim, compensatory and punitive damages, that he would procure if he eventually prevailed on his underlying false imprisonment and *Monell* claims).

At bottom, the Harers' backward-looking access-to-court claim is untenable because their underlying tort claims are timely, facially plausible, and still pending. With the ultimate resolution of their wrongful death case in doubt, the Harers' access-to-court claim is not ripe for judicial review.[3] *See Waller*, 922 F.3d at 603 (adopting the Ninth Circuit's approach of resolving these types of undeveloped backward-looking access-to-court claims on ripeness grounds). While the wrongful death case is pending, we cannot determine whether the police cover-up thwarted the effectiveness of any potential remedies because those remedies do not yet exist. *See Church of Our Lord & Savior Jesus Christ v. City of Markham, Ill.*, 913 F.3d 670, 676 (7th Cir. 2019) (defining the objective of ripeness as "avoid[ing] premature adjudication" of "claims premised on uncertain or contingent events").

All the same, it is theoretically possible that the Harers will be able to plead an access claim in the future if their wrongful death action falters in later states of litigation. Because the Harers' claim requires further factual development, it is not ripe. *See Amling v. Harrow Indus. LLC*, 943 F.3d 373, 378 (7th Cir. 2019) (citation omitted) (describing ripeness as barring us "from deciding a question that depends on so many future events that a judicial opinion would be 'advice about remote

---

[3] This holding applies with equal measure to the Harers' allegations of both pre- and post-filing conduct. As explained *infra*, however, their post-filing allegations are likely nonactionable.

contingencies.'"). We therefore order the dismissal without prejudice of the Harers' access-to-court claim (Count II).

### C. Post-Filing Police Interference

Even if the Harers lacked a remedy, and their access claim was thus ripe for review, the district court erred in any event when it upheld the access claim on the officers' alleged post-filing obstruction. The district court appears to have declined to dismiss the Harers' access-to-court claim solely based on the December 2018 meeting. The court reasoned that "Channahon fooled [the Harers] into dropping their suit" during that meeting, resulting in them having "to litigate an unnecessary motion to reopen." The court recognized an access claim predicated on unnecessary delay and the litigation costs associated with reviving a lawsuit.

As an initial matter, we agree with the Fifth Circuit that "showing delay alone is not enough; the plaintiffs must likewise show the delay caused some further harm to their cause of action." *Waller*, 922 F.3d at 603; *see also supra* at 12–13 (delay does not necessarily spell the demise of litigation). Expense associated with delay, in and of itself, also does not tangibly harm a cause of action. *Cf. Owsley*, 2020 WL 2832116 at *2 ("None of the Supreme Court's 'access to the courts' cases hints that a potential discovery problem can be the basis of a [separate] suit, when the … courts are open."). Instead, the kind of injury cognized by judicial-access law is, as we stated above, the complete foreclosure of relief. *Supra* at 16; *see also Lynch*, 703 F.3d at 1157 ("Plaintiff has already litigated his underlying claim of excessive force against Defendant Officers unsuccessfully, and so his opportunity to recover on that claim has passed. … Plaintiff now seeks, by way of his denial-of-access claim in the district court, relief against Defendant

Officers that is unavailable on his underlying claim for excessive force.").

More to the point, the December 2018 meeting occurred well after the Harers filed their suit. We find instructive the framework our sister circuits have implemented to further refine the backward-looking claim into the following dichotomy: officers' actions hindering judicial access that predate the lawsuit's filing compared with those postdating it. *See, e.g.*, *Swekel*, 119 F.3d at 1263. Importantly, if the abuse occurs post-filing, "the aggrieved party is already in court and that court usually can address the abuse, and thus, an access to courts claim typically will not be viable." *Id.*; *see also Estate of Smith*, 318 F.3d at 511 ("[A] plaintiff typically cannot recover for any cover-ups or discovery abuses after an action has been filed inasmuch as the trial court can deal with such situations in the ongoing action."); *Sousa*, 702 F.3d at 128 ("If a governmental official is lying, for instance, the plaintiff can attempt to demonstrate the falsity of the official's statements through discovery and argument before the court.").

In this case, the district court's justification for its disposition was the December 2018 meeting. Regardless of whether we believe defendants' statements in the meeting were proper, the district court was in the best position to deal with any potential deception that occurred during that meeting. *See Owsley*, 2020 WL 2832116 at *2 (underscoring that courts can "issue[ ] discovery orders, and if the objects of those orders concealed or destroyed evidence, the [trial] judge [may find] them in contempt or impose[ ] other appropriate sanctions"); *see also id.* ("Spoliation of evidence all too often requires resolution in the course of litigation."); *Henderson v. Frank*, 293 F. App'x 410, 413 (7th Cir. 2008) ("This alleged

violation took place after he had filed the suit in question, and so the proper forum for addressing the abuse was the court hearing that case, not another court in a later lawsuit.").

The right of access to court, after all, "encompasse[s] a right to file an action, but not the right to proceed free of discovery abuses after filing." *Foster v. City of Lake Jackson*, 28 F.3d 425, 430 (5th Cir. 1994). The whole "point of the backward-looking right of access … is to ensure that plaintiffs have that opportunity—not to convert every instance of deception by a governmental witness into a separate federal lawsuit." *Sousa*, 702 F.3d at 128–29; *see also Bell*, 746 F.2d at 1265 ("Not every act of deception in connection with a judicial proceeding gives rise to an action under Section [1983]."). Accordingly, post-filing conduct generally cannot serve as a basis for an access-to-court claim. Instead, a plaintiff must utilize pre-filing actions to build any access-to-court claim.

### D. Qualified Immunity

As a final observation, we note that we need not—and we do not—reach qualified immunity. It remains an open question, however, whether the Harers can prove that the Channahon defendants violated their clearly established constitutional rights. *Cf. Harrell*, 169 F.3d at 432–33 (emphasizing that this is "[t]he more difficult question" and "find[ing] that it is not clear enough that the … *Bell* approach would be extended to this kind of case"). We leave that matter for another day, depending on the potential development of facts not included in this record.

### III. Conclusion

For the reasons stated above, we REVERSE the judgment of the district court and REMAND WITH INSTRUCTIONS to dismiss without prejudice the access-to-court claim (Count II).