RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0065p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

CHARLES JACKSON,

*Plaintiff-Appellee*,

*v.*

CITY OF CLEVELAND, et al.,

*Defendants*,

BARBARA RHODES MARBURGER,

*Defendant-Appellant*.

No. 22-3253

_____

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:21-cv-01679—J. Philip Calabrese, District Judge.

Argued: December 8, 2022

Decided and Filed: April 6, 2023

Before: MOORE, STRANCH, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Stephen W. Funk, ROETZEL & ANDRESS, LPA, Akron, Ohio, for Appellant. M. Caroline Hyatt, FRIEDMAN, GILBERT & GERHARDSTEIN, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Stephen W. Funk, ROETZEL & ANDRESS, LPA, Akron, Ohio, for Appellant. M. Caroline Hyatt, Jacqueline Greene, FRIEDMAN, GILBERT & GERHARDSTEIN, Cincinnati, Ohio, Sarah Gelsomino, FRIEDMAN, GILBERT & GERHARDSTEIN, Cleveland, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court in which STRANCH, J., joined, and MURPHY, J., joined in part. MURPHY, J. (pp. 20–26), delivered a separate opinion concurring in part and concurring in the judgment.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. Charles Jackson filed a 42 U.S.C. § 1983 lawsuit, claiming that Barbara Rhodes Marburger, an assistant prosecutor at the Cuyahoga County Prosecutor's Office, denied him access to the courts by redacting exculpatory information from his investigative file, which had been requested from her office under the Ohio Public Records Act. The district court found that she was protected by neither absolute immunity nor qualified immunity and denied her motion to dismiss. Although we agree with the district court that Marburger is not entitled to absolute immunity, for the reasons stated below we **REVERSE** the district court's denial of qualified immunity.

## I. BACKGROUND

In 1991, Charles Jackson was wrongfully convicted of murder and was sentenced to twenty years to life in prison. R. 1 (Compl. ¶¶ 56–57, 79–81) (Page ID #10, 13). The Ohio Eighth District Court of Appeals upheld his conviction on appeal. *Id.* ¶ 58 (Page ID #10). Between 1996 and 2013, Jackson made multiple attempts to have his conviction set aside and his sentence vacated, but each time he was denied relief. *Id.* ¶¶ 59–61 (Page ID #10). Eventually, the Ohio Innocence Project became involved in his case. *Id.* ¶ 62 (Page ID #10).

In February 2016, pursuant to the Ohio Public Records Act, the Ohio Innocence Project requested from the Cleveland Division of Police (CDP) documents relating to the investigation of Joe Travis's murder and the arrest of Charles Jackson. *Id.* ¶ 63 (Page ID #11). It received no response. In June 2016, the Innocence Project renewed its request to CDP and filed a new records request with the Cleveland Law Department. *Id.* ¶¶ 63–65. In August 2016, the Innocence Project sent another records request, this time to the Cuyahoga County Prosecutor's Office. *Id.* ¶ 66 (Page ID #11). Assistant Prosecuting Attorney Barbara Marburger responded and produced a heavily redacted file. *Id.* ¶¶ 66–68, 70 (Page ID #11).

The Ohio Public Records Act exempts "investigatory work product" and "[t]rial preparation record[s]" from production as public records. Ohio Rev. Code § 149.43(A)(1)(g),

(h); (A)(2)(c); (A)(4).   At the time the Ohio Innocence Project filed its public-records request, the exemption from production for investigatory work product and trial preparation records extended until all "'trials,' 'actions' and/or 'proceedings' have been fully completed," including postconviction proceedings.  *State ex rel. Steckman v. Jackson*, 639 N.E.2d 83, 92, 94 (Ohio 1994); *State ex rel. WLWT-TV5 v. Leis*, 673 N.E.2d 1365, 1369 (Ohio 1997).  These precedents remained in force until December 2016, several months after Marburger produced the redacted documents to the Ohio Innocence Project, when the Ohio Supreme Court overturned the cases and ruled that the investigatory-work-product exception did not extend beyond the conclusion of trial, and that as a result, convicted individuals could use the Ohio Public Records Act to obtain investigative files for the purpose of seeking postconviction relief.  *State ex rel. Caster v. City of Columbus*, 89 N.E.3d 598, 609 (Ohio 2016).

In May 2017, nine months after Marburger's production of redacted records, the City of Cleveland responded to the Innocence Project's initial request and produced the unredacted file. R. 1 (Compl. ¶ 69) (Page ID #11).  The unredacted documents included significant exculpatory evidence.  The documents contained early statements by witnesses that contradicted their trial testimony, as well as reports revealing unduly suggestive identification and interview procedures, fabrication of evidence, witness statements that identified other potential suspects or that denied that Charles Jackson was the killer, and attempts to coerce false testimony from witnesses.  *Id.* ¶ 71 (Page ID #11–12).  Neither Jackson nor his counsel had ever received this information before.  *Id.* ¶ 72 (Page ID #12).  In August 2017, the Cuyahoga County Prosecutor's Office produced an unredacted version of their file, which contained the same exculpatory police reports as the one produced in May 2017 by the City of Cleveland.  *Id.* ¶ 75 (Page ID #12).

In May 2018, the Ohio Innocence Project filed a Petition for Post-Conviction Relief and a Motion for Leave to File a Motion for New Trial on Jackson's behalf.  *Id.* ¶ 79 (Page ID #13).  In these materials, Jackson relied upon the exculpatory information that Marburger had redacted from the investigative file in the Cuyahoga County Prosecutor's Office's initial production.  In November 2018, a state-court judge vacated Jackson's conviction and released Jackson from custody on bond.  *Id.* ¶ 80 (Page ID #13).  In August 2019, the State moved to dismiss the charges against him, and he was finally exonerated.  *Id.* ¶ 81 (Page ID #13).

Jackson filed a lawsuit in the U.S. District Court for the Northern District of Ohio in August 2021 against the City of Cleveland, a number of CDP officers and supervisors, Cuyahoga County, and Assistant Prosecuting Attorney Barbara Marburger.  R. 1 (Compl. ¶¶ 7–14) (Page ID #3–5).  He made claims under 42 U.S.C. § 1983 for *Brady* violations, fabrication of false evidence, unconstitutional identification procedures, false arrest, malicious prosecution, and failure to intervene, in addition to *Monell* claims against the City of Cleveland and Cuyahoga County.  *Id.* ¶¶ 260–362 (Page ID #45–61).  Against Barbara Marburger, Jackson alleged a claim of denial of access to courts.  *Id.* ¶¶ 315–30 (Page ID #54–56).  Specifically, he claimed that her actions in redacting exculpatory information from the Cuyahoga County Prosecutor's Office's file before turning it over to the Ohio Innocence Project denied him access to the courts.

Marburger filed a motion to dismiss in the district court.  R. 11 (Marburger Mot. to Dismiss at 1) (Page ID #126).  She argued that she was entitled to absolute immunity for her role in redacting the exculpatory information.  *Id.* at 6–8 (Page ID #136–38).  She further argued that she was entitled to qualified immunity.  *Id.* at 8–20 (Page ID #138–50).  Finally, she argued that Jackson's claim was barred by the statute of limitations.  *Id.* at 20 (Page ID #150).  The district court denied her motion to dismiss.  *Jackson v. City of Cleveland*, 586 F. Supp. 3d 737, 754 (N.D. Ohio 2022).  It reasoned that when Marburger responded to the public-records request, there were no legal proceedings pending, and that "[r]esponding to a public records request is not 'intimately associated with the judicial phase of the criminal process' sufficient to confer absolute immunity."  *Id.* at 747.  Marburger had argued that because Jackson's counsel had made the records request, Marburger knew that Jackson was engaged in "a form of post-conviction advocacy that entitle[d] her to absolute immunity."  *Id.*  The district court found that because there were no proceedings pending at the time of the records request, there could be no absolute immunity.  *Id.* at 748.

The district court then evaluated Marburger's claim of qualified immunity.  It found that Jackson had made out a plausible claim for denial of access to the courts, which requires a showing that:  "(1) Plaintiff had a nonfrivolous underlying claim; (2) State actors took obstructive actions, (3) those actions caused substantial prejudice to the underlying claim, for which a State court cannot provide a remedy; and (4) Plaintiff would have sought relief on the

underlying claim that is otherwise now unattainable." *Id.* at 748, 749. The district court found that Jackson had alleged the underlying causes of action to which he had allegedly been denied access: motions for a new trial and petitions for postconviction relief that he had lost between 1991 and 2013. *Id.* at 749. The district court also rejected Marburger's argument that Jackson did not permanently lose his remedies because he obtained relief when the state acquiesced in his motion for a new trial and eventually dismissed the charges. *Id.* The district court reasoned that this argument confused backward- and forward-looking claims. *Id.* It dismissed Marburger's argument that damages recoverable against the other defendants would adequately compensate Jackson for his delayed release and exoneration, concluding that Jackson's "claims against Ms. Marburger and the County seek to vindicate different rights and interests than those against the other Defendants. As a result, the damages flowing from these alleged harms differ." *Id.* The district court then considered whether Jackson needed to exhaust his state-court remedies before bringing an access-to-the-courts claim and concluded that he was not required to do so, distinguishing Jackson's case from *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997). *Jackson*, 586 F. Supp. 3d at 749–50.

The district court next considered whether Jackson's right of access to the courts was clearly established. *Id.* at 750–51. It distinguished cases requiring plaintiffs to show previous Sixth Circuit or Supreme Court cases with similar fact patterns on the ground that they "involve[d] police officers responding in a matter of moments to life-threatening situations." *Id.* It concluded that because Marburger "took nearly two months to respond" to the records request and "had time to consider whether withholding exculpatory information might violate Jackson's rights or prejudice his efforts at exoneration" Jackson had stated a plausible claim that Marburger had knowingly violated his clearly established constitutional rights. *Id.* at 751.

Finally, the district court considered whether the fact that Marburger redacted the investigative file pursuant to Ohio state law entitled her to qualified immunity. It determined that this issue was not a "pure legal question[] capable of neat resolution at the pleading stage," and it saw "no reason to deviate from the general rule in this Circuit that qualified immunity is best decided at summary judgment." *Id.* Marburger filed this timely interlocutory appeal.

## II. JURISDICTION

The courts of appeals have appellate jurisdiction over "final decisions of the district courts." *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985) (quotation marks omitted). Though denials of motions to dismiss are often non-final orders, "under the collateral-order doctrine a 'limited set of district-court orders are reviewable' even though they are 'short of final judgment.'" *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 896 (6th Cir. 2019) (quoting *Peatross v. City of Memphis*, 818 F.3d 233, 239 (6th Cir. 2016)). Included in these collateral orders are "a district court's denial of a defendant's motion for dismissal or summary judgment on the grounds of absolute immunity or qualified immunity 'to the extent that it turns on an issue of law.'" *Watkins v. Healy*, 986 F.3d 648, 658 (6th Cir. 2021) (quoting *Forsyth*, 472 U.S. at 530). We therefore have appellate jurisdiction over the district court's denial of Marburger's motion to dismiss based on absolute and qualified immunity.

## III. ANALYSIS

### A. Standard of Review

We review de novo a defendant's claims that they are entitled to absolute or qualified immunity. *Spurlock v. Thompson*, 330 F.3d 791, 796 (6th Cir. 2003); *Watkins*, 986 F.3d at 660. At the motion-to-dismiss stage, a plaintiff's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in [the plaintiff's] favor." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

### B. Absolute Immunity

Prosecutors receive absolute immunity from suit for conduct in initiating and pursuing criminal prosecutions. *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). Absolute immunity is the exception to the general presumption that qualified immunity "is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486–87 (1991). When

determining whether a prosecutor's actions should be shielded by such an expansive grant of immunity, we apply a functional approach that "looks to 'the nature of the function performed, not the identity of the actor who performed it.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Officials seeking the protection of absolute immunity bear the burden of showing that absolute immunity is justified and that "qualified immunity does not suffice." *Stockdale v. Helper*, 979 F.3d 498, 502 (6th Cir. 2020); *Buckley*, 509 U.S. at 269.

In our circuit, "[t]he critical inquiry is how closely related is the prosecutor's challenged activity to [their] role as an advocate intimately associated with the judicial phase of the criminal process." *Howell v. Sanders*, 668 F.3d 344, 349–50 (6th Cir. 2012) (quoting *Ireland v. Tunis*, 113 F.3d 1435, 1443 (6th Cir. 1997)); *see also Prince v. Hicks*, 198 F.3d 607, 611 (6th Cir. 1999). When a prosecutor performs administrative or investigatory functions that "do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings," they are "not entitled to absolute immunity." *Prince*, 198 F.3d at 611 (quoting *Buckley*, 509 U.S. at 273). But administrative actions that are "directly connected with the conduct of a trial" are protected by absolute immunity. *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009). Therefore, "we must identify precisely the wrongful acts" that a prosecutor has taken and "classify those acts according to their function." *Adams v. Hanson*, 656 F.3d 397, 403 (6th Cir. 2011). We must also take into consideration the timing of the actions taken: "[W]here the [prosecutor's] role as advocate has not yet begun, namely prior to indictment, or where it has concluded, absolute immunity does not apply." *Spurlock*, 330 F.3d at 799. Functions that are administrative or investigative in nature include "'giving legal advice to police,' making 'out-of-court statements' at a press conference, making statements 'in an affidavit supporting an application for an arrest warrant,' and 'authorizing warrantless wiretaps in the interest of national security.'" *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) (citations omitted) (first quoting *Spurlock*, 330 F.3 at 798; then quoting *Fitzsimmons*, 509 U.S. at 277–78; then quoting *Kalina v. Fletcher*, 522 U.S. 118, 119 (1997); and then quoting *Mitchell*, 472 U.S. at 520).[1]

---

[1]Marburger claims that absolute immunity applies whenever a prosecutor engages in "even unquestionably illegal or improper conduct . . . so long as the general nature of the action is part of the normal duties of a

The act in question here is Barbara Marburger's response to the Ohio Innocence Project's public-records request and her redaction of exculpatory information in the Cuyahoga County Prosecutor's Office's file on Jackson. This is an administrative task that is not closely related to "an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Prince*, 198 F.3d at 611 (quoting *Buckley*, 509 U.S. at 273). Marburger has provided no historical or common-law support for her argument that responding to a records request after the conclusion of a trial should be protected by absolute immunity. And, as the district court found significant, there was no trial or other ongoing judicial proceeding at the time the records request was filed; Jackson's most recent attempt at having his conviction overturned had concluded in 2013. Marburger never took on a role as an advocate in a judicial proceeding related to Jackson.

Marburger contends that absolute immunity shields prosecutors from liability for failure to disclose exculpatory evidence "in connection with a criminal proceeding," Appellant Br. at 46, and that under state law at the time, such a proceeding extended until the completion of a defendant's sentence, *id.* at 48. Notwithstanding any provisions of Ohio law, Marburger fails to cite any case indicating that a criminal proceeding in the federal courts extends from the moment of indictment to the moment an individual is released from incarceration. She also misstates the law in our circuit; we have held that "absolute immunity protects a prosecutor from civil liability for the non-disclosure of material exculpatory evidence *at trial*." *Koubriti*, 593 F.3d at 470 (emphasis added). The Sixth Circuit has extended absolute immunity for adversarial acts of prosecutors past the trial context in some circumstances, but those circumstances are limited to "post-conviction proceedings, including direct appeals, habeas corpus proceedings, and parole proceedings, *where the prosecutor is personally involved in the subsequent proceedings and continues [their] role as an advocate*." *Spurlock*, 330 F.3d at 799 (emphasis added). To be protected by absolute immunity in both the trial and postconviction contexts, a prosecutor must be acting as an advocate in a judicial proceeding. Marburger was not acting as an advocate when she responded to the Innocence Project's records request. The fact that Jackson's investigative file was ultimately used to support a petition for postconviction relief did not transform the

---

prosecutor." Appellant Br. at 46 (quoting *Hatchett v. City of Detroit*, 495 F. App'x 567, 571 (6th Cir. 2012)). This fundamentally misstates both Sixth Circuit and Supreme Court precedent on absolute immunity, which explicitly require a functional analysis of the challenged action. *See Burns*, 500 U.S. at 486; *Buckley*, 509 U.S. at 269; *Adams*, 656 F.3d at 402.

records request into a judicial proceeding. At the time of the records request, there was no adversarial judicial proceeding taking place in Jackson's case, and Marburger was not preparing to participate in such a proceeding. The Sixth Circuit has not extended the scope of absolute immunity to the extent Marburger claims.

We also find unconvincing Marburger's arguments that she ought to be treated the same as a prosecutor representing the government in a postconviction proceeding would have been. She contends that, at the time of the Innocence Project's records request, the Ohio Public Records Act required incarcerated individuals to file a motion with their sentencing judge to obtain a copy of public records relevant to a justiciable claim, and that if Jackson had done so, his request could have been considered by a prosecutor acting as an advocate in his criminal case and entitled to absolute immunity. Appellant Br. at 48–49; *see also* Ohio Rev. Code § 149.43(B)(8); *Steckman*, 639 N.E.2d at 92. But absolute immunity is derived from the historical common law. *Imbler*, 424 U.S. at 421. It would make little sense for absolute immunity to turn on minutiae of current state law. And our precedent regarding claims of absolute immunity directs us to consider the prosecutor's actions and whether they are inherently part of a prosecutor's adversarial function as an advocate of the state in criminal proceedings. We cannot consider hypothetical actions that might have been taken in a different set of circumstances; here, we are squarely presented with the question of whether responding to a records request after the conclusion of a criminal trial and appeal is an action that is an inherent part of a prosecutor's adversarial function as an advocate of the state in criminal proceedings. We hold that it is not. The district court correctly denied Marburger absolute immunity.

## C. Qualified Immunity

We next consider Marburger's claim of qualified immunity. Qualified immunity protects public officials from civil liability for damages when their conduct does not violate the plaintiff's "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In order to overcome a defendant's qualified immunity defense, 'a plaintiff must plausibly allege facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged

conduct.'" *Moderwell v. Cuyahoga County*, 997 F.3d 653, 659–60 (6th Cir. 2021) (quotation marks omitted) (quoting *Marvaso v. Sanchez*, 971 F.3d 599, 605 (2020)).  We may address these questions in any order.  *Cahoo*, 912 F.3d at 897.

"[I]t is 'generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.'"  *Siefert v. Hamilton County*, 951 F.3d 753, 761 (6th Cir. 2020) (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)).  "Although an officer's 'entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point,' that point is usually summary judgment and not dismissal under Rule 12."  *Hart v. Hillsdale County*, 973 F.3d 627, 635 (6th Cir. 2020) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015)).  This is because "'[i]t is often perilous to resolve a Rule 12(b)(6) motion on qualified immunity grounds' because development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law."  *Hart*, 951 F.3d at 635 (quoting *Singleton v. Kentucky*, 843 F.3d 238, 242 (6th Cir. 2016)).  "Without more than the complaint to go on, the court 'cannot fairly tell whether a case is "obvious" or "squarely governed" by precedent,' making qualified immunity inappropriate."  *Siefert*, 951 F.3d at 761 (quoting *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019)).  "The test is whether, reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right."  *Cahoo*, 912 F.3d at 899 (quoting *Courtright*, 839 F.3d at 518).  We first ask whether Jackson alleged a plausible claim that his constitutional right of access to the courts has been violated.

### 1.  Violation of Constitutional Rights

Plaintiffs with nonfrivolous legal claims have a constitutional right to access the courts to bring those claims.  *Christopher v. Harbury*, 536 U.S. 403, 414–15 & n.12 (2002).  Jackson brought a backward-looking access-to-courts claim, in which he alleged that Marburger barred his access to the courts by concealing exculpatory evidence so that he could not obtain an adequate remedy for his underlying postconviction or habeas relief claims in state and federal courts.  R. 1 (Compl. at ¶¶ 315–30) (Page ID #54–55).  This claim has four elements:  "(1) a non-frivolous underlying claim; (2) obstructive actions by state actors; (3) 'substantial[ ] prejudice' to the underlying claim that cannot be remedied by the state court; and (4) a request

for relief which . . . is now otherwise unattainable." *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (citations and quotations omitted). On appeal, Marburger argues that Jackson has not satisfied only the final two elements. Appellant Br. at 31.**[2]**

A plaintiff "must show actual injury" or prejudice to their underlying claim when stating a claim for interference with access to the courts. *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005); *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). If the obstructive action occurs before the plaintiff can file their claim, they "must establish that such abuse denied [them] 'effective' and 'meaningful' access to the courts." *Swekel*, 119 F.3d at 1263 (quoting *Bounds v. Smith*, 430 U.S. 817, 822 (1977)). A plaintiff can do so by showing that the defendant's actions prevented plaintiff "from filing suit in state court or rendered ineffective any state court remedy [plaintiff] previously may have had." *Id.* at 1263–64. We have identified "having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline" as some examples of actual prejudice to pending or contemplated litigation. *Harbin-Bey*, 420 F.3d at 578.

Jackson has plausibly stated "'substantial[] prejudice' to [his] underlying claim that cannot be remedied by the state court." *Flagg*, 715 F.3d at 174 (quoting *Swekel*, 119 F.3d at 1264). The concealment of exculpatory information deprived Jackson of access to "all of the requisite facts to file" his claim, and therefore Marburger's concealment "den[ied] the plaintiff[] the opportunity to file a lawsuit" for at least nine months. *Green v. City of Southfield*, 925 F.3d 281, 289 (6th Cir. 2019) (Murphy, J., concurring) (first quoting *Swekel*, 119 F.3d at 1263; and then quoting *Thompson v. Boggs*, 33 F.3d 847, 852 (7th Cir. 1994)). In *Swekel*, the Sixth Circuit contemplated that delay alone could prejudice the plaintiff's ability to prevail in state court, but ultimately denied the plaintiff's access-to-courts claim in part because the plaintiff failed to present evidence that she had attempted to gain access to state courts before filing her access-to-courts claim. Here, we know for certain that Jackson's state-court remedies were

---

**[2]**The concurrence suggests that Jackson has not shown that Marburger engaged in an "obstructive" act, and that by seeking to hold Marburger responsible for redacting the exculpatory information in the Cuyahoga County Prosecutor's Office's possession, Jackson is effectively bringing a claim that would conflict with the Supreme Court's holding in *District Attorney's Off. For Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68–69 (2009). Crucially, Marburger does not contest that she engaged in obstructive actions.

rendered ineffective without the exculpatory information contained in the file because he had previously and unsuccessfully attempted to obtain postconviction relief on several occasions.

Marburger redacted the investigative file and delivered the redacted file to the Innocence Project in August 2016. Jackson ultimately received the unredacted file from the City of Cleveland in May 2017—nine months later—and then filed a petition for a new trial, after which his conviction was vacated and he was released from prison in November 2018. Had Marburger sent Jackson an unredacted file, he could have applied for postconviction relief and been released approximately nine months earlier. Marburger's actions "effectively cover[ed]-up evidence" and temporarily "foreclosed [Jackson] from filing suit in state court," because her concealment "render[ed] [his] state court remedy ineffective." *Swekel*, 119 F.3d at 1262, 1264. Marburger thus caused Jackson substantial prejudice on his postconviction relief claims.

Even if, as Marburger contends, Jackson could have filed an action before his sentencing judge seeking release of the records, the state court cannot turn back time. The state court must be able to remedy the "'substantial[] prejudice' to the underlying claim," not the obstructive action. *Flagg*, 715 F.3d at 174 (quoting *Swekel*, 119 F.3d at 1264). Though the state courts could have, after *State ex rel. Caster v. Columbus*, issued a writ of mandamus requiring Marburger to produce the unredacted file, or the state sentencing judge could have ordered the production of the unredacted file, they could not have remedied the delay of his postconviction filing. Thus, there is *no* procedure that could "remedy the wrong alleged." *Green*, 925 F.3d at 288 (Murphy, J., concurring) (quoting *Swekel*, 119 F.3d at 1265).

To be sure, a previous panel of the Sixth Circuit suggested in a brief unpublished and nonbinding decision that delay *alone* does not substantially prejudice an underlying claim, *Winburn v. Howe*, 43 F. App'x 731, 734 (6th Cir. 2002). But Jackson did not suffer *only* delay—he also suffered the injury of prolonged wrongful incarceration as a result of delay. In *Winburn*, the plaintiff complained of a lost or destroyed habeas petition. But his habeas petition was eventually considered on the merits and denied by a federal district court, and he was unable to show that earlier consideration of his petition would have produced a different result. *Winburn*, 43 F. App'x at 734. The delay did not injure Winburn or his claims. *Id.* The panel in *Winburn* was not presented with the question of whether the plaintiff could have shown prejudice

if his habeas petition had been granted on the merits, and other circuits have not been presented with this issue, either. In *Waller v. Hanlon*, 922 F.3d 590 (5th Cir. 2019), the Fifth Circuit held that delay of an excessive-force claim caused by police obstruction did not "cost" the plaintiffs anything. *Id.* at 602. In the case of a suit seeking only monetary damages, that may perhaps be true. Jackson's "compromised" claim, however, was not for monetary damages; instead, he sought his freedom. Earlier consideration of his petition would have freed him from wrongful incarceration at an earlier date, and thus the delay in access to the unredacted investigative file cost him nine months of freedom—nine months of being able to see his family, nine months of going outside into the sunshine and the fresh air at will. Delay of a claim for postconviction relief that operates to prolong wrongful incarceration constitutes prejudice.

Finally, Jackson has requested "a remedy that could not be obtained on an existing claim." *Harbury*, 536 U.S. at 421. In *Harbury*, when dismissing the plaintiff's access-to-courts claim, the Supreme Court reasoned that the plaintiff "ha[d] not explained, and it is not otherwise apparent, that she can get any relief on the access claim that she cannot obtain on her other tort claims." *Id.* at 422. The *Harbury* Court went on to say that her "access claim cannot address any injury she has suffered in a way [that her] presently surviving intentional-infliction claims cannot . . . ." *Id.* That was because in *Harbury*, the plaintiff had a surviving intentional-infliction claim against the CIA defendants. *Id.* at 409, 410, 412. Importantly, the underlying claim that she asserted had been compromised as a result of the State Department's obstruction was an intentional infliction of emotional distress claim against the CIA, *the very same claim* that was presently pending against the CIA—though, of course, she was no longer able to seek an injunction, as she claimed she would have.[3] She could thus still obtain the "single payment for the harm caused by her husband's death," Concurrence at 25, that she sought from the federal government through her existing intentional-infliction claim against the CIA, and therefore there was no different remedy available to her.

---

[3]This squares with the Supreme Court's statement in *Harbury* explaining its rationale for requiring a showing that the remedy requested cannot be awarded in some other lawsuit. Immediately after describing that requirement, the Court noted that "after all, [there is] no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." 536 U.S. at 415. Harbury was faced with this precise issue: she could receive the same damages from the federal government by simply litigating her (much more straightforward) intentional-infliction claim against the CIA.

Jackson's case is distinct from Harbury's in several ways. First, Jackson's surviving § 1983 claims against the City of Cleveland and the defendant officers are *not* the same claims as the postconviction relief petition that Marburger obstructed. A postconviction petition for relief is different in kind from a damages claim, even if they are derived from the same *Brady* violations. Second, as the district court correctly noted, Jackson's access-to-courts claim seeks redress for a different wrong than his *Brady* claims against the individual police officers and the City of Cleveland. His claim against Marburger seeks recompense for his inability to file a petition for postconviction relief for nine additional months as a result of her obstructive actions in 2016. His claims against the city and its officers seek compensation for the officers' wrongdoing in 1991 and of course for Jackson's resultant twenty-seven years of wrongful imprisonment. If Jackson's claims were ultimately vindicated, Marburger and the defendant officers would each be held responsible for damages for the final nine months of his imprisonment—the defendant officers for obtaining his wrongful conviction and imprisonment in the first instance, and Marburger for *prolonging* his imprisonment by obstructing his access to the courts. Third, Harbury could obtain the same single payment from the federal government for the harms caused by her husband's death through either her access-to-courts claim or her intentional-infliction claim. Jackson, on the other hand, could not obtain payment at all from Marburger without his access-to-courts claim, and the Court in *Harbury* explicitly contemplated that a plaintiff could bring an access-to-courts claim in which the underlying cause of action might even be "timely and subject to trial, but for a different remedy than the one sought under the access claim, *or against different defendants*." *Harbury*, 536 U.S. at 416 n.13 (emphasis added). The requirement that a plaintiff request "relief unobtainable in other suits," *id.* at 416, is therefore best read to require that a plaintiff request relief unobtainable *from this entity* in any other suits. Harbury was still able to obtain relief from the federal government. But as previously stated, Jackson cannot obtain relief from Marburger in any other way. Jackson has therefore satisfied the fourth prong by requesting relief from Marburger that is unavailable to him in any other action.

Another panel of this court offered a different rule for this fourth prong of a backward-looking access-to-courts claim, stating that the plaintiff must request "relief which the plaintiff *would have sought on the underlying claim* and is now otherwise unattainable." *Flagg*, 715 F.3d

at 174 (emphasis added). But the holding in *Flagg* was based on the plaintiff's failure to satisfy the *third* prong, substantial prejudice, *id.* at 178–79, and therefore its discussion of the fourth prong is dicta and does not bind this panel. *Harbury* contemplates that in a backward-looking access-to-courts claim a plaintiff could seek relief that could not be obtained otherwise, not that the plaintiff must specifically request the relief they would have received in the lawsuit they were unable to file as a result of the denial of access to the courts. *Harbury*, 536 U.S. at 421–22 & nn.21, 22. Specifically, the Supreme Court explained that the plaintiff in *Harbury* could not maintain a cause of action for denial of access to the courts because the district court had not dismissed her tort claims against the defendants and she could still seek monetary damages on those claims, and therefore she had not shown "that she can get any relief on the access claim that she cannot obtain on her other tort claims, *i.e.*, those that remain pending in the District Court." *Harbury*, 536 U.S. at 422. The Court went on to note that "[t]his might not be the case where, for example, the underlying claim had been tried or settled for an inadequate amount given official deception . . . and thus likely barred by res judicata, or where the statute of limitations had run." *Id.* at 422 n.22 (citations omitted). This important context from the *Harbury* opinion makes clear that *Flagg*'s statement of the fourth prong of an access-to-courts claim is too narrow, and that the correct inquiry is whether the plaintiff has requested "a remedy that could not be obtained on an existing claim," *Harbury*, 536 U.S. at 421, rather than "relief which the plaintiff *would have sought on the underlying claim* and is now otherwise unattainable," *Flagg*, 715 F.3d at 174 (emphasis added). In other words, Jackson does not need to seek release from prison on his access-to-courts claim because that is the relief that was denied to him. He can instead seek damages from Cuyahoga County and from Marburger because he cannot obtain any other remedy against either defendant. Jackson has plausibly stated a claim that Marburger violated his right of access to the courts when she removed exculpatory information from the file she supplied in response to the Ohio Innocence Project's public-records request and thereby effectively prevented him from filing for postconviction relief.

## 2. Clearly Established Law

We next consider the second prong of qualified immunity, which asks whether the right that has been violated was clearly established, meaning that "every 'reasonable official would

[have understood] that what he is doing violates that right.'" *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alteration in *Anderson*); *see also Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). The Supreme Court has often "stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). A rule is too general "if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Id.* (quoting *Anderson*, 483 U.S. at 641). Nevertheless, an official "can still be on notice that their conduct violates established law even in novel factual circumstances. . . . Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 268 (1997)); *see also Al-Kidd*, 563 U.S. at 741; *cf. Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam) (vacating and remanding a Fifth Circuit decision granting qualified immunity because no reasonable official could have concluded that it was permissible to house a prisoner in deplorably unsanitary conditions for six days even though there was no previous case directly on point). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

The district court found that the Sixth Circuit had recognized backward-looking access-to-courts claims and defined the elements of the claim with particularity, thus making it beyond debate that restricting an individual's access to the courts is a constitutional violation. *Jackson*, 586 F. Supp. 3d at 750. It rejected Marburger's argument that, based on *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017), Jackson was required to identify a specific case with a similar fact pattern. *Id.* at 750–51. The district court reasoned that in contrast to those officers, Marburger had at least several weeks to consider whether redacting the substantive information from Jackson's file would violate his rights. *Id.* at 751. It concluded that Jackson had stated a claim that Marburger knowingly violated Jackson's rights. *Id.*

At the time of Marburger's actions, it was clearly established that "if a party engages in actions that effectively cover-up evidence and this action renders a plaintiff's state court remedy ineffective, they have violated his right of access to the courts." *Swekel*, 119 F.3d at 1262; *see also Spurlock*, 330 F.3d at 801 n.3 ("[I]t is clearly established that a violation of the right of access occurs if a party engages in actions that effectively cover-up evidence, thereby rendering a plaintiff's court remedy ineffective. As such, any reasonable official would know [the defendant's] conduct was constitutionally inappropriate." (citation omitted)).

The contours of this right must be "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590. The Supreme Court has repeatedly urged the courts of appeals that general principles can clearly establish law only in obvious cases, *see, e.g.*, *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021); *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018); *Wesby*, 138 S. Ct. at 590, and has criticized the courts of appeals for citing cases "too factually distinct to speak clearly to the specific circumstances," *Mullenix*, 577 U.S. at 18; *see also City of Tahlequah v. Bond*, 142 S. Ct. 9, 11–12 (2021). The question then becomes whether the principle outlined in *Spurlock* and *Swekel* is sufficiently specific or whether the facts of those cases are sufficiently similar that every reasonable official in Marburger's position would know that concealing exculpatory information by redacting the investigative file violated Jackson's right of access to the courts. *Swekel* refers to two examples of situations in which officials engaged in cover-ups that constitute violations of the right of access to the courts: one in which police officers concealed a murder by one of their officers, and one in which prosecutors covered up the fact that a murder had occurred and that one of their fellow prosecutors was the murderer. *Swekel*, 119 F.3d at 1262. And the court in *Swekel* denied the plaintiff's access-to-courts claim because she had not shown that the defendants' actions had rendered her state-court suit ineffective. *Id.* at 1264. *Spurlock* is closer; it considered a prosecutor who engaged in obstructive actions and to whom the Sixth Circuit denied qualified immunity. That prosecutor, however, engaged in egregious conduct that included coercing witnesses to maintain false testimony and concealing evidence that would have revealed a wrongful conviction. *Spurlock*, 330 F.3d at 798–801, 801 n.3.

The rule set out in *Swekel* and *Spurlock*, that a violation of the right of access to the courts occurs when an official "engages in actions that effectively cover-up evidence, thereby rendering a plaintiff's court remedy ineffective," *Spurlock*, 330 F.3d at 801 n.3, is too general. "[T]he unlawfulness of [Marburger's] conduct 'does not follow immediately from the conclusion that [the rule is] firmly established.'" *Wesby*, 138 S. Ct. at 590 (quoting *Anderson*, 483 U.S. at 641). We do not believe that every reasonable official would conclude that redacting exculpatory information included in a response to a public-records request constitutes "actions that effectively cover-up evidence" on par with coercion of witnesses or concealment of a murder. The Sixth Circuit had never considered an access-to-courts claim based on redaction in a response to a public-records request, and a reasonable official, considering the legal landscape at the time, could conclude that they would not be violating constitutional or statutory law by redacting exculpatory information from a response to a public-records request. Marburger did not interfere or coerce witnesses or conceal evidence of a murder, as detailed in *Swekel* and *Spurlock*. Ohio state law at the time expressly classified all investigatory work product and trial preparation material as not public records for the purposes of public-records requests, which would arguably allow the refusal to disclose exculpatory information contained in those records. Ohio Rev. Code § 149.43(A)(1)(g), (h); (A)(2)(c); (A)(4). State law also created an alternative method for defendants to access investigative records and any exculpatory information therein. Ohio Rev. Code § 149.43(B)(8). Furthermore, the Supreme Court has held that defendants do not have a *Brady* right to exculpatory evidence in the postconviction context and must show instead that "consideration of [the] claim within the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *District Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68–69 (2009) (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)). A reasonable official could conclude that, in light of *Osborne*, they had no special obligation to provide exculpatory information outside of ordinary state procedures for obtaining postconviction relief, provided that those procedures are adequate. We cannot say that every reasonable official would have apprehended that they were violating Jackson's constitutional right of access to the courts by redacting exculpatory information when responding to a

public-records request, even if they did so purposefully. We hold that Marburger is protected by qualified immunity because in 2016 it was not clearly established that redacting exculpatory information from a response to a public-records request constituted "actions that effectively cover-up evidence" and thus actions that violate the right of access to the courts.

## IV. CONCLUSION

We hold that Marburger is not entitled to absolute immunity for redacting Jackson's investigative file in response to the Ohio Innocence Project's records request because she performed an administrative function that is not intimately connected with judicial proceedings. We also hold that Jackson has plausibly alleged that Marburger violated his right of access to the courts by redacting exculpatory material from the investigative file and thereby stymieing his efforts to file a petition for postconviction relief. But it was not yet clearly established in 2016 that redacting exculpatory information from a response to a public-records request would violate the right of access to the courts, and therefore we must grant qualified immunity to Marburger. Accordingly, we **REVERSE** the district court's order denying qualified immunity.

———————————

**CONCURRENCE**

———————————

MURPHY, Circuit Judge, concurring in part and concurring in the judgment. In 1991, Charles Jackson was wrongfully convicted of murdering a man in Cleveland, Ohio. According to Jackson, Cleveland police officers intentionally failed to produce exculpatory information at his criminal trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Decades later, Jackson's case file in the Cuyahoga County Prosecutor's Office still contained the exculpatory information. He alleges that the Ohio Innocence Project asked for this file in 2016 using Ohio's public-records laws. Barbara Marburger, a former assistant prosecutor, responded to this request by disclosing a "heavily redacted" file that left out the exculpatory information. Compl., R.1, PageID 11. After the prosecutor's office later provided the unredacted file in 2017, Jackson won his release from prison. *Id.*, PageID 12–13. He alleges that Marburger's failure to immediately disclose the full file to the Ohio Innocence Project violated his right to access the courts. I agree with my colleagues that Marburger did not have absolute immunity under § 1983 when responding to this public-records request. I likewise agree that Marburger's conduct did not violate clearly established constitutional law. Qualified immunity under § 1983 thus insulates her from Jackson's access-to-courts claim. *See City of Tahlequah v. Bond*, 142 S. Ct. 9, 11–12 (2021) (per curiam).

But I part ways with my colleagues' conclusion that, apart from this qualified-immunity defense, Jackson's complaint stated a viable access-to-courts claim against Marburger. As I have noted, this "nebulous" claim "remains a work in progress." *Green v. City of Southfield*, 925 F.3d 281, 287–89 (6th Cir. 2019) (Murphy, J., concurring) (citation omitted). The Supreme Court has merely assumed the claim's existence. *See Christopher v. Harbury*, 536 U.S. 403, 414 n.9 (2002). And circuit courts have had trouble even pinpointing its constitutional source. Is it the First Amendment right to "petition the Government for a redress of grievances"? U.S. Const. amend. I. Or the Fourteenth Amendment right not to be "deprive[d]" of "life, liberty, or property, without due process of law"? U.S. Const. amend. XIV, § 1. We and other courts have

identified these possibilities, among several others.  *See Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir. 1997); *Ryland v. Shapiro*, 708 F.2d 967, 971–72 (5th Cir. 1983).

Because courts remain unsure of the constitutional claim's source, they have created its elements with little regard for the constitutional text.  In seemingly common-law fashion, we have created a four-part test for plaintiffs to prove this claim.  *See Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013).  Other courts have adopted similar multi-part tests.  *See, e.g.*, *Harer v. Casey*, 962 F.3d 299, 308 (7th Cir. 2020); *Waller v. Hanlon*, 922 F.3d 590, 602 (5th Cir. 2019).  As for our elements, we have said that:  (1) a plaintiff must at one time have possessed a "non-frivolous underlying claim"; (2) the state-actor defendant must have engaged in "obstructive actions"; (3) these actions must have caused "'substantial[] prejudice' to the underlying claim" that cannot be remedied by the court that would have heard it; and (4) the plaintiff must request the relief that the plaintiff "would have sought on the underlying claim" but is "now otherwise unattainable."  *Flagg*, 715 F.3d at 174 (citation omitted).

Jackson's complaint does not plausibly plead these elements.  To be sure, I agree that the complaint pleads our first element:  that Jackson possessed a "non-frivolous" *Brady* claim. *Flagg*, 715 F.3d at 174.  He has pursued this claim in two venues seeking two forms of relief.  In his state criminal case, he filed a post-conviction motion asking the state court to overturn his conviction because of the *Brady* violation.  Compl., R.1, PageID 13.  Once the prosecutor conceded the "materiality" of the exculpatory information, Jackson won his release.  *Id.*  In this federal civil case, he filed a § 1983 suit seeking damages against the Cleveland police officers who committed the *Brady* violation.  *Id.*, PageID 45–47.  This claim remains pending in the district court.

I also agree that we cannot resolve Jackson's access-to-courts claim on our second element—that Marburger engaged in an "obstructive" act—because Marburger did not dispute this element on appeal.  *Flagg*, 715 F.3d at 174.  Yet I pause to highlight that our cases offer little guidance on what they mean by "obstructive" conduct.  We should interpret this claim's elements to reflect (not refute) broader constitutional principles.  *See Green*, 925 F.3d at 288–89 (Murphy, J., concurring).  And the Supreme Court has held that the Constitution does not typically compel state actors to disclose information in their possession.  *McBurney v. Young*,

569 U.S. 221, 233 (2013).  It has also held that a defendant's *Brady* right to the disclosure of exculpatory information does not extend beyond the criminal trial.  *See District Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68–69 (2009).

Jackson, though, does not allege that Marburger participated in the *Brady* violation in 1991.  Compl., R.1, PageID 6–10.  She entered the scene 25 years later when responding to the Ohio Innocence Project's public-records request.  *Id.*, PageID 11–12.  Jackson also does not challenge Marburger's contention that her public-records redactions adhered to the Ohio Supreme Court's then-existing reading of Ohio law.  *See State ex rel. Steckman v. Jackson*, 639 N.E.2d 83, 92–94 (Ohio 1994).  (The court changed its reading months later, which led to the release of Jackson's full file.  *See State ex rel. Caster v. Columbus*, 89 N.E.3d 598, 608–09 (Ohio 2016).)  As far as I can tell, then, Jackson seeks to hold Marburger liable under the Constitution for her state-law-authorized refusal to disclose information to a third party.  If we imposed this constitutional duty on Marburger, how would it fit with the Supreme Court's precedent that the Constitution does not require state actors to disclose information in their possession?  And wouldn't such a duty create the very post-trial *Brady* right that the Court has said does not exist?  I am not sure of the answer to these questions.  But we can save them for another day given the parties' briefing choices.

Jackson's access-to-courts claim nevertheless founders on our third element:  that he show "substantial prejudice" to his *Brady* claim that the court considering the claim cannot remedy.  *Flagg*, 715 F.3d at 174 (citation omitted).  This element requires Jackson to prove that Marburger's conduct "foreclosed" the relief that he seeks on his *Brady* claim.  *Swekel*, 119 F.3d at 1264.

But Marburger's initial redactions of Jackson's case file have not prohibited him from seeking either type of *Brady* relief that he has requested (his release and damages).  As for the injunctive-type relief that he once sought in state court, Jackson cannot show prejudice for an obvious reason:  he won.  Despite Marburger's conduct, Jackson obtained his release from prison by pursuing this *Brady* claim in his post-conviction motion.  Without a "lost remedy," Jackson cannot establish that Marburger prejudiced his victorious *Brady* claim.  *Harbury*, 536 U.S. at 416.

As for the monetary relief that he now seeks in this federal suit, Jackson makes no claim that Marburger's redactions of his case file harmed his ability to prove his *Brady* claim against the Cleveland officers in any way. *See Swekel*, 119 F.3d at 1263–64. He, for example, does not allege that Marburger's conduct prevented him from filing a timely § 1983 claim. *See Harbury*, 536 U.S. at 422 n.22. Nor does he allege that her conduct triggered a claim-preclusion defense because he litigated and lost an earlier suit at a time when he lacked the later-obtained case file. *See id.*

Maybe so, Jackson responds, but he would have won his release in state court *sooner* if Marburger had not held up the disclosure of his unredacted file. Yet this delay does not show prejudice. Indeed, we have already made this precise point when rejecting a prisoner's claim that state actors impeded (but did not prevent) his pursuit of a habeas petition. *Winburn v. Howe*, 43 F. App'x 731, 734 (6th Cir. 2002). As we said in *Winburn*, "[d]elay in filing legal documents alone does not rise to the level of a constitutional deficiency." *Id.* Rather, a plaintiff must show that the defendant's delay-causing conduct generated a "litigation-related" harm to the legal claim. *Id.* Given that Jackson has won on his state-court *Brady* claim, he cannot identify this special type of prejudice. No obstacle blocked the litigation of his *Brady* claim to a state-court victory.

While only an unpublished decision, *Winburn* has plenty of company. The other circuit courts to consider this question all agree that litigation delay does not suffice. As the Seventh Circuit explained, police misconduct that "delays redress" but "still allow[s] sufficient time for the plaintiff" to pursue the claim does not prove prejudice. *Harer*, 962 F.3d at 307 (citation omitted). Or as the Fifth Circuit put it, "showing delay alone is not enough; the plaintiffs must likewise show the delay caused some further harm to their cause of action." *Waller*, 922 F.3d at 603.

My colleagues respond that the delay caused a tangible *non-litigation* harm (Jackson's incarceration for several more months) and that this harm allows Jackson to pursue an access-to-courts claim. Under the existing caselaw, however, a plaintiff must identify "*litigation-related*" harm—not outside-the-courtroom harm. *Winburn*, 43 F. App'x at 734 (emphasis added). That is, the prejudice must affect the "cause of action" *itself*. *Waller*, 922

F.3d at 603. This limit flows out of the nature of the claim: it is not a substantive-due-process claim alleging the denial of the right to liberty; it is an access-to-courts claim alleging the denial of the right to litigate. My colleagues' reasoning thus rejects our logic in *Winburn* and creates a circuit split.

My colleagues' analysis of prejudice also conflicts with *Harbury*—the case in which the Supreme Court assumed the existence of this access-to-courts claim. The plaintiff in *Harbury* alleged that the delay in disclosing information had led to the most serious of non-litigation harms: her husband's death. 536 U.S. at 405. She suggested that certain CIA defendants had collaborated with the Guatemalan army to detain, torture, and kill her husband. *Id.* at 406. She next suggested that other State Department defendants "intentionally misled" her when she expressed concerns about her husband's safety. *Id.* at 406–07. These latter defendants had allegedly deprived her of her right to ask the courts for an injunction that could have saved his life. *Id.* at 409–10.

The Court held that this access-to-courts claim against the State Department defendants failed for two reasons. It noted that her complaint did not identify any underlying claim that the failure to disclose truthful information had prevented. *Id.* at 418. She later identified this underlying claim in oral argument as one for the intentional infliction of emotional distress against the CIA defendants. *Id.* at 419 & n.17, 421. Even assuming that she could amend her pleadings in this fashion, the Court next held that she could still seek damages on this intentional-infliction claim in her pending suit against the CIA defendants. *Id.* at 420–21. Money, of course, could not turn back the clock. So the State Department defendants' conduct had permanently foreclosed her ability to seek an injunction against the CIA defendants that might have saved her husband's life (and thus the delay prejudiced her in this tragic real-world sense). *Id.* at 421. But the Court responded that she could not now seek that injunction through her access-to-courts claim either. *Id.* at 421–22. And because she could seek damages on both claims (the intentional-infliction claim against the CIA defendants and the access-to-courts claim against the State Department defendants), it held that she must pursue her tort claim rather than her access-to-courts claim. *Id.*

Identical logic applies here. Apart from Jackson's access-to-courts claim against Marburger, he continues to pursue his *Brady* claim against the Cleveland officers. Neither through his pending *Brady* claim nor through his pending access-to-courts claim can Jackson get back the extra months in prison that he allegedly served due to the delayed disclosure of his case file. But he can seek damages for this extra time under his *Brady* claim. So he is "not entitled to maintain the access claim as a substitute" for that *Brady* claim. *Id.*

This reasoning brings me to our fourth and final element. I agree with my colleagues that, notwithstanding stray language in *Flagg*, this element requires Jackson to prove that he may not now seek the relief through his *Brady* claim that he pursues through his access-to-courts claim. *See Harbury*, 536 U.S. at 416; *cf. Flagg*, 715 F.3d at 174. In this suit, however, he did not identify in the district court any impediment that would bar him from using his *Brady* claim to seek payment for the extra months that he spent in prison allegedly due to Marburger's delayed disclosure. *Cf. County of Los Angeles v. Mendez*, 581 U.S. 420, 430–31 (2017). To the contrary, he pursues both claims at the same time in the same suit—something that other courts would categorically prohibit him from doing. *See, e.g.*, *Harer*, 962 F.3d at 309; *Waller*, 922 F.3d at 603.

My colleagues assert that Jackson seeks relief on his access-to-courts claim that he cannot pursue on his *Brady* claim because he pursues the two claims against *different defendants*: he sued Marburger for the alleged access-to-courts violation in 2016 and the Cleveland officers for the alleged *Brady* violation in 1991. This logic would allow a plaintiff to pursue an access-to-courts claim whenever the defendant who allegedly violated the access-to-courts right is different from the defendant who committed the underlying violation. I do not read this fourth element to permit that result. Rather, it asks whether the plaintiff seeks to use both claims to redress the same injury. *Harbury* again proves my point. The plaintiff there sought a single payment for the harm caused by her husband's death. So, even though the tort claim ran against the CIA defendants and the access-to-courts claim ran against the State Department defendants, the Court did not let the latter claim proceed. *Id.* at 421. Likewise, Jackson seeks to use both claims to pursue a payment for the extra time that he spent in prison. I thus would follow *Harbury* here.

Because Jackson's complaint fails to state an access-to-courts claim, I respectfully concur in the majority opinion in part and concur in the judgment.